Filed 2/26/14  F.W. Spencer & Son v. Harris Construction CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| F.W. SPENCER & SON, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> HARRIS CONSTRUCTION COMPANY, INC., <br><br> Defendant and Appellant. | Consolidated Case Nos. F064782 & F064793 <br><br> (Super. Ct. No. 622179) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County. William A. Mayhew, Judge.

Lozoya & Lozoya and Frank J. Lozoya IV; Lax & Stevens and Paul A. Lax for Defendant and Appellant.

Flynn Williams Riley, Sloan C. Bailey and Gary Sloboda for Plaintiff and Respondent.

-ooOoo-

Harris Construction Company, Inc. (Harris) appeals a judgment awarding one million dollars to F.W. Spencer & Son, Inc. (Spencer) in this action to recover delay damages based on breach of contract and common counts.  Harris contends the jury verdict in Spencer's favor resulted from the trial court's errors in (1) severing Spencer's

damage claims for trial after Spencer completed its case-in-chief, (2) allowing jury instructions and a verdict form on legal theories not before the jury that served only to confuse the jurors, (3) excluding percipient testimony from Harris's witnesses on the ground it constituted expert testimony and allowing Spencer's experts to testify on the reasonableness of any delay, (4) exhibiting bias against Harris's trial counsel in front of the jury, and (5) denying Harris's new trial motion on the issue of excessive damages. Harris further contends the trial court erred in awarding Spencer prejudgment interest under Civil Code section 3287, subdivision (a)[1] and in failing to reduce the amount of attorney fees awarded to Spencer.

We find no merit in Harris's arguments as to the jury's verdict and to the award of attorney fees. We do, however, find the trial court erred in awarding prejudgment interest under section 3287, subdivision (a). Since Harris conceded below that prejudgment interest was awardable under section 3287, subdivision (b), the alternative ground on which Spencer sought prejudgment interest, we will reduce the prejudgment interest accordingly. In all other respects, we affirm the judgment and post-judgment order awarding attorney fees.

## FACTS

In 2004, the Modesto City Schools entered into a $79,197,000 contract with Harris, a general contractor, for the construction of James C. Enochs High School (the Project). In June 2004, Harris entered into a subcontract with Spencer, a mechanical contractor, to perform the plumbing and HVAC work on the Project for $7,545,000. The scope of Spencer's work included furnishing and installing a wet chemical fire suppression system, plumbing, heating, ventilating and air conditioning, and a direct digital control and energy management system. The work was to be completed in

---

[1] Subsequent statutory references are to the Civil Code unless otherwise noted.

2.

accordance with the "Harris Baseline Schedule[,]" which Spencer assumed gave it "reasonable time to install work in a reasonable manner with a reasonable flow."

The Project originally was scheduled to finish on April 24, 2006. As the Project progressed, the baseline schedule changed a number of times for a variety of reasons, including weather and design issues. In June 2005, Harris notified Spencer that the Project owner had granted a non-compensable time extension on the Project from April 2006 to June 24, 2006, as the "exceptionally bad" winter weather had a definite impact on the schedule progress. Spencer signed a change order agreeing to the time extension without additional compensation.

Spencer claimed Harris caused numerous problems on the site with supervision, coordination of the various trades, weatherization, and access issues. When Spencer agreed to accept the no cost change order in 2005, Spencer informed Harris of its concerns regarding Harris's management of the project and the financial impact to Spencer should the schedule continue to change. In response, Harris agreed to address financial impacts as they materialized. In February 2006, Spencer's president, Bruce Bonar, wrote Harris, expressing concerns that the schedule was continuing to slip.

In May 2006, Bonar wrote Harris with an estimated cost of the impact the delays were having on Spencer. Bonar estimated the project would be at least 120 days late and, on that basis, believed Spencer would incur additional costs of $626,847, which included extension costs for the project manager, assistant project manager and plumbing superintendant, and rental costs and home office overhead, as well as an efficiency factor due to the extension/delay. Bonar also advised Harris that Spencer had incurred costs due to lack of flow and efficiency factors which had not yet been quantified.

Most of the buildings in the Project were not substantially completed until December 2006. The entire Project was completed on April 20, 2007, with a notice of completion submitted on May 17, 2007.

On December 21, 2006, Bonar wrote Harris with an update of the additional costs Spencer incurred due to the delays in construction. At that time, Spencer still was working on the Project. Bonar estimated the delay and impact costs Spencer incurred totaled $870,969.20. Harris did not pay the claim.

*This Lawsuit*

Spencer filed this lawsuit against Harris in December 2007. The complaint alleged causes of action for breach of contract, common counts, quantum meruit and to collect on a payment bond. In its breach of contract cause of action, Spencer alleged Harris breached the subcontract by failing and refusing to pay Spencer the value of various items of work performed and materials Spencer supplied under the subcontract, or for changes to the work, including delays, impacts and constructive changes. Damages were alleged to include additional direct and indirect expenses, additional costs as a result of Harris's retention of funds, and amounts due under the subcontract, in a sum exceeding $850,000 plus interest and attorney fees. In its common counts cause of action, Spencer sought to recover the reasonable value of the labor, equipment, materials and services it provided on the project, which it alleged exceeded $850,000.

In a hearing held on September 24, 2010, the trial court granted Spencer's motion to exclude the expert opinion of any witness offered by Harris, as Harris did not disclose its expert witnesses after being served with a demand for exchange of expert witnesses. Also at that hearing, the trial court found that Harris's trial counsel, Deb C. Pedersdotter, had lied to and misled the court in every statement she had made about the disclosure of expert witnesses. Accordingly, the court decided to send a transcript of the hearing, as well as a transcript of the August 24, 2010 hearing at which the statements were made, to the State Bar for further investigation.[2]

---

[2] August 24, 2010 was to have been the first day of the jury trial. Pedersdotter informed the court she had been involved in a traffic accident at the end of July 2010, which led to her experiencing "some problems." The trial was continued so Spencer

4.

*Motions in Limine*

A jury trial commenced on April 19, 2011.[3]  In pretrial proceedings, the trial court made several in limine rulings.  Based on the trial court's earlier order precluding Harris from offering expert testimony, Spencer filed motion in limine number one to bar Harris from introducing testimony in support of its defenses that are matters only within the knowledge of experts.  Harris filed a written opposition, asserting the motion should be denied and the trial court's prior order applied "as appropriate to the evidence in fact offered at trial."  At the hearing, Pedersdotter explained that while she agreed Harris did not have a designated expert witness, percipient witnesses, such as Harris's president, should be able to testify, for example, regarding what was wrong with a claim from a contractor's perspective.  The trial court explained its earlier ruling:  "Any testimony that you would have had to designate an expert on and did not, you are barred.  That's the extent of my ruling."  Pedersdotter agreed that was "acceptable."  The court warned that the ruling was "very broad" and she would be barred from having her witness testify about the matters she was just talking about.

Pedersdotter responded that the president would not be testifying as an expert; instead, he would be testifying regarding his evaluation of the claim as Harris's president. Pedersdotter explained: "If he can't say how he evaluated the claim, I mean, that's percipient testimony about what happened during the course of construction and during the evaluation of this claim.  It's not expert testimony.  It's not something that we ever would have designated somebody for.  He has to explain what Harris did and why it was reasonable."  The court answered that it would not rule on "every little bit," but, "to make

_____

could file a motion to bar Harris from offering expert testimony.  Pedersdotter was to provide the court with medical reports from her two doctors within a week.

[3] Subsequent references to dates are to dates in 2011 unless otherwise noted.

5.

it plain[,] [i]f I consider it as something you would have had to designate an expert on, they're not going to testify about it."

Spencer's motion in limine number three sought to exclude the testimony of any Harris personnel regarding the reasonableness of Spencer's bid estimate as Harris's person most knowledgeable was not qualified as an expert on the reasonableness of bid estimates and Harris was barred from introducing expert testimony. In opposing the motion, Pedersdotter argued that a blanket prohibition of any witness testimony concerning Spencer's bid would be improper and pointed out that should Spencer object to the qualifications of any witness Harris might offer, it must challenge those qualifications through the "appropriate process." In addressing this motion at the pretrial hearing, Pedersdotter told the court Harris was not talking about expert testimony, but about "percipient testimony as to what the bids were." The court responded that it had not found "a percipient testimony exception in the expert disclosure rules." The court stated that percipient witnesses can testify on factual matters, but not expert ones. Pedersdotter asserted Harris's witnesses only were going to testify that Harris received a set number of bids, what the bids were and that they called Spencer because its bid was low. The court responded that was okay, but the witnesses could not testify the bid should have been higher, and as long as they did not do that, Harris would be fine, "but other than that, they cannot give expert opinions, and that would take an expert opinion." The court stated that the witnesses could testify about factual, "layperson kind of stuff."

Spencer's motion in limine number five sought to preclude Harris from presenting testimony that delay damages Spencer incurred were not recoverable under the subcontract, which provides that Spencer's sole remedy should Harris delay, interfere with, disrupt or hinder Spencer's work is an extension of time to complete work and under no circumstances would Harris be liable to pay Spencer compensation or damages for delay. Spencer asserted in its in limine motion that this "no damages for delay" provision is unenforceable in public works projects under Public Contracts Code

section 7102, which allows for the recovery of delay damages by a subcontractor where the contractee is responsible for the delay, and the delay is unreasonable under the circumstances and not within the parties' contemplation. Based on this provision, Spencer argued Harris should be barred from arguing or offering testimony that delay damages were not recoverable pursuant to the subcontract.

In discussing this motion at the pretrial hearing, the court stated that an expert could testify as to whether the delay was reasonable or unreasonable, but a witness could not interpret the clause itself. In opposing the motion, Pedersdotter argued Harris should be able to testify about the no-damages-for-delay clause because that was the basis for the parties' actions. Pedersdotter agreed that the court ultimately would determine the interpretation or application of the clause, but that would be done best with the facts introduced. The court responded that no one would be interpreting the clause for the jury except itself, but an expert could testify regarding the terms "reasonable" and "unreasonable." The court, however, recognized that they would "have to cross it when we get there, because, you, know, I can't make every ruling that possibly will come up in the trial right now." The court asked counsel not to go into this area at trial until it ruled on the issue, and when it got to that point, counsel could come to the side bar and it would rule at that point. Pedersdotter put the court and counsel on notice that she planned to have Harris's president, who oversaw the "claims process," testify about this subject matter. The court responded that if she was going to go into that during opening statement, she could talk in terms of delay, but it did not want her to go into the contract term itself. The court clarified that a witness could testify that he relied on that paragraph in the contract, but the witness could not interpret the provision.

*Harris's Opening Statement*

During her opening statement, Pedersdotter asserted that Spencer had developed an attitude on the Project that if something went wrong, they should be compensated for it, which was not a "contract-supported approach" to the Project. Pedersdotter pointed

7.

out that the subcontract provided that "[i]f you are delayed in the performance of the work, we will compensate you by giving you additional time to perform.  But we are not going to give you any money."  Spencer's counsel objected based on the discussion during in limine motions about contract interpretation.  The court overruled the objection.

After the opening statements concluded, the court explained, outside the jury's presence, that it overruled the objection because it had ruled in the in limine motions that no witness was going to interpret the no-damages-for-delay clause.  The court read Public Contract Code section 7102 and stated that because the issue was raised in opening statement, he would have to instruct the jury about this code section.  Spencer's counsel had given the court such a proposed instruction, but the court did not think it was complete.  Accordingly, the court asked Spencer's counsel to rewrite the instruction and provide it to the court in the morning; if the court did not like the instruction, it would simply read the code section to the jury.  The court also invited Pedersdotter to write an instruction if she so desired.

At the outset of trial the following day, the court explained to the jury that it had heard about a no-damages-for-delay clause in the subcontract; it was the court's duty to interpret contract language for the jury; and therefore, the court would instruct them on the contract clause in question, which had to be read in conjunction with Public Contract Code section 7102.  The court read the following:  "Under California law, a no damages for delay clause in a contract on a public works project will not bar a contractor from recovering damages for delay where the parties sought to be charged for the delay was [sic] responsible for the delay, and where the delay is unreasonable, under the circumstances.  And where the delay was not within the contemplation of the parties at the time the parties entered into the contract in question."[4]  The record is silent regarding

---

[4] The court's instruction was not the same as the one Spencer proposed, which read: "Under California law, a 'no damages for delay' clause in a contract on a public works project will not bar a contractor from recovering damages for delay where the

8.

whether one or both parties prepared this instruction, whether any party objected to it, or whether the court itself prepared it.

*Evidence on Damages*

By its lawsuit, Spencer sought to recover the amount Harris owed it for undisputed but unpaid change orders, along with prompt payment penalties (the change order claim), as well as delay and impact damages, including inefficiency costs, extra costs and extra overhead, incurred on the Project (the delay claim). In its trial brief, Spencer itemized its damages on the change order claim to include $120,210 for unpaid change orders and $112,997 for penalties, and its damages on the delay claim at $803,113.

As pertinent to this appeal, three of Spencer's witnesses testified about the delay and impact damages, namely Bonar, Spencer's CEO William Spencer, and expert witness Christopher Anderson. Bonar testified he notified Harris in December 2006 that Spencer had incurred an estimated $870,969 in delay costs. This was comprised of extension costs for the project manager, assistant project manager and plumbing superintendent; rental charges; four months of home office overhead; an efficiency factor for six additional plumbers and six additional sheet metal workers on site; and additional costs for responding to punch lists.

According to Bonar, Spencer was "out of pocket" almost $1.1 million, meaning they spent much more on material, labor and equipment than they were paid. That number did not include overhead or profit. Bonar testified the amount owed on the change orders totaled $120,787, and his calculation of the impact claim was around $860,000. Bonar confirmed, however, that this was not the precise amount Spencer was seeking at trial, as Spencer's expert came up with a different number. Spencer's loss was much bigger.

---

delay is unreasonable under the circumstances and not within the contemplation of the parties."

On cross-examination, Bonar testified the amount of money he believed Spencer was entitled to be paid by Harris in connection with all the claims in the lawsuit, not including attorney fees and interest, was $1,232,000. That number reflected what Spencer lost on the job, $1.1 million, plus the 12 percent markup for overhead and profit that was part of Spencer's original bid. Bonar testified Spencer had taken the position with Harris it was willing to negotiate using the $870,000 delay claim without going through a recalculation, because the number would have been much bigger. Bonar acknowledged the expert Spencer hired calculated the impact damages as $803,000, which number he thought Spencer was using "at this point."

On redirect, Bonar testified that Spencer had reduced the dollar figure of its impact claim to $803,000 based on the expert's analysis, but, in his view, the $870,000 figure was still a good one and his company was out a lot more than that, namely over $1.1 million out-of-pocket. When asked if he was only seeking $803,000 for the impact claim, Bonar responded: "We put 870 out there. We stood by the 870. When the expert came back and came up with 803, it's, again, as I said earlier, relatively close, and it's a more conservative number, but we're sticking with that number at this point." Bonar testified that $870,000 of its approximately $1.4 million stop notice, served on Modesto City Schools in April 2007, constituted Spencer's impact claim, and in an August 2007 letter to Pedersdotter, Spencer mentioned its outstanding impact claim of $870,000, which figure had not differed since December 2006.

Anderson, a construction management consultant who testified as an expert witness, conducted a detailed analysis of Spencer's cost accounting information, which was an independent evaluation of the delay and impact damages. Based on that analysis, he opined Spencer was entitled to delay and impact damages totaling $803,113. In conducting his analysis, Anderson prepared a graphic comparing Spencer's actual costs incurred during the course of construction, $8,833,994, to the total payments it had

10.

received, $7,721.976, which resulted in an out-of-pocket loss of $1,112,018. This loss does not include the markup Spencer planned to make on the Project.

Anderson also prepared a chart summarizing his analysis of Spencer's delay and impact costs. He performed his own independent calculation based on Spencer's accounting information to determine what he believed was the reasonable amount due Spencer on the Project. The $803,113 figure is comprised of three components: (1) $518,232 for labor inefficiency or loss of productivity; (2) $180,127 in delay costs, which are time-driven costs associated with the project schedule extension; and (3) a 15 percent markup of $104,754, which percentage is based on the subcontract's terms and is very standard for the industry.

Anderson reached the $518,232 figure by looking at three factors from a Mechanical Contractors Association of America (MCA) study, namely stacking of trades, crew size inefficiency and ripple effect. Anderson explained that the MCA study quantifies the impact in each area as either minor, a 10 percent impact; average, a 20 percent impact; or severe, a 30 percent impact. Anderson utilized the minor factor in each area so he could be as conservative as possible. Totaling the three factors up resulted in a 30 percent anticipated inefficiency pursuant to the MCA industry studies he utilized based in part on his experience and review of the contemporaneous documents on the Project. Anderson reduced the 30 percent factor to 25 percent total inefficiency, since his goal was to be conservative in his calculations and he believed that represented a conservative estimate. Multiplying 25 percent times the estimated total man hours spent on the Project – 36,240 – results in an inefficiency of 9,060 man hours. He then multiplied the 9,060 man hours by the average pay rate of $57.20 to reach a labor inefficiency of $518,232.

The delay costs of $180,127 include time driven costs, namely labor costs for the project and assistant project managers and plumbing superintendant, and delay rental

11.

costs. To get the contractual markup, Anderson totaled the labor inefficiency and delay costs and multiplied that by 15 percent to get $104,754.

Anderson had reviewed Spencer's December 2006 request for compensation, which he said was submitted in a format that is not unusual or different than most projects. Anderson would call the request a "change order request, in essence, where Spencer is attempting to estimate its cost associated with the delay and impact on the project." He did not see anything unreasonable or unusual in the request. In Anderson's mind, Bonar's request was a reasonable estimate of Spencer's costs associated with the delay and impact on the Project. According to Anderson, the variation between his total of $803,000 and Spencer's $870,000 request was due to Anderson's methodology. Anderson tried to rely as little as possible on estimates and to support the calculations based on actual data. Spencer's estimate relied on certain rates for certain people based on Bonar's judgment, while in preparing his estimate, Anderson extracted and used only those costs he could reasonably support with the cost report document itself. Anderson also believed the rates Bonar used included markup and "things of that nature[,]" whereas his rates were bare rates, with the markup added at bottom line.

Spencer's CEO and owner, William Spencer, also testified that the company lost over one million dollars. He believed the company's delay and disruption claim was approximately $806,000. He helped look over the $870,000 figure his company had presented to Harris, which was higher than the trial expert's figure. When asked to explain the difference, he responded that three people could look at anything and get a different opinion.

*Severance of Damage Claims*

At the outset of the tenth day of trial, May 4, after Spencer had completed its case-in-chief and several of Harris's witnesses had testified, the trial court informed counsel, outside the jury's presence, that it was proposing, on its own motion, to "bifurcate" the case pursuant to Code of Civil Procedure sections 1048, subdivision (b) and 592. Trial

12.

would continue only on the claim for impact or delay damages, and issues concerning change orders, penalties and interest would be arbitrated or tried to a separate jury in the future. The court believed this was necessary because the trial was moving slower than anticipated. It previously had informed the parties that the court would be dark from May 12 to June 2, therefore the jury needed to reach a verdict before Wednesday, May 11.

The court further explained it was also concerned as a result of the conference on proposed jury instructions and verdicts held after testimony concluded the prior day. The court did not believe they had usable jury verdicts, despite twice having asked counsel to submit both jury instructions and verdicts; they were due the first time just before trial and the second time by Friday, April 29. Defense counsel, however, did not submit any instructions until about 4 p.m. on May 3, just prior to the conference. The proposed instructions were inadequate to instruct the jury on any issue. Noting that the jurors had invested many days of their lives in this case and were never told the case could extend into June, the court expressed its concern that if the case had to be finished in June, a mistrial might result from lost jurors. The court believed that since the delay claim was the major issue in the case, proceeding on that claim may result in a settlement of the other claims. The court asked counsel for their thoughts at the noon break.

The trial proceeded with the continued testimony of a defense witness. At the noon break, the court allowed counsel to address its proposal. Spencer's counsel asked the court to consider an alternative to bifurcation, arguing any delay in prosecuting the case was not Spencer's fault, as it had filed a motion for directed verdict and submitted revised instructions and verdict forms that he believed substantially complied with the court's comments. Pedersdotter stated Harris was opposed to bifurcation, pointing out that Harris had less time to present its defense than Spencer had to present its case-in-chief. The court stated it was going to bifurcate the case because it was the only way to

13.

have a chance of finishing, and it would advise the jurors when they returned that the only issue they would hear was delay and impact damages.

After the lunch break, but before the jury was brought in, Spencer's counsel restated Spencer's objection to bifurcation. The court did not change its mind. Once the jurors returned, the court explained to the jury it had decided to exercise its discretion granted to it as the trial judge by the Code of Civil Procedure to bifurcate certain issues in the case, so the only issue for the jury to decide in the trial was "whether Harris is legally responsible for some delay or delays to Spencer. That is, delays as far as Spencer is concerned and if so, what damages, if any, Spencer may have sustained." The court further explained that no one was responsible for the decision except the court.[5]

*Jury Instructions and Verdict*

After testimony concluded, the jury was instructed on two theories of recovery, breach of contract and common counts, using CACI Nos. 303, 350, and 371. The jury also was given CACI No. 3934, which advised that Spencer sought damages from Harris under more than one legal theory, but each item of damage could be awarded only once, regardless of the number of legal theories alleged. The jury also was given special instructions regarding the issues the jury would be deciding and additional findings it needed to make for Spencer to recover delay damages and causation.

On May 10, the jury returned a $1,000,000 verdict against Harris on a verdict form that presented only the following question: "As to the issue of delays and impacts presented to us, we the jury find in favor of the Plaintiff, F.W. SPENCER & SON, INC. and against Defendant, HARRIS CONSTRUCTION COMPANY, INC. in the amount of $_____." Polling of the jurors revealed the verdict was 10 to 2.

---

[5] After trial in this case concluded, the parties settled Spencer's change order claim. Harris agreed to pay Spencer $188,000 in exchange for a release of all claims between the parties except Spencer's delay/impact claim and related interest, judgment and attorney fees from this trial.

14.

*Motion for Prejudgment Interest*

Two weeks after the jury's verdict, Spencer filed and served its motion for $384,678 in prejudgment interest pursuant to section 3287, subdivision (a) or, in the alternative, $341,667 in prejudgment interest pursuant to section 3287, subdivision (b). Spencer asserted it was entitled to prejudgment interest from December 21, 2006 to May 2011 under section 3287, subdivision (a), based on the amount it claimed Harris owed it for delay and impact damages in Bonar's December 21, 2006 letter to Harris, namely $870,969.20. Alternatively, Spencer asked the trial court to exercise its discretion under section 3287, subdivision (b), to award it prejudgment interest on the jury's verdict of $1,000,000 from the date the complaint was filed, December 28, 2007, to May 2011.

Two days later, May 27, Pedersdotter became ineligible to practice law because of disciplinary proceedings unrelated to this case. On May 31, Spencer served on Harris's corporate offices a notice to appoint attorney pursuant to Code of Civil Procedure section 286,[6] asking Harris to appoint another attorney to represent it in this action. On June 15, Spencer served on Harris's corporate offices a second notice to appoint attorney pursuant to Code of Civil Procedure, section 286, along with Spencer's motion for prejudgment interest. Harris failed to file or serve an opposition to the motion for prejudgment interest.

The trial court posted a tentative ruling on the motion, but a hearing was not requested. Accordingly, the trial court confirmed the tentative ruling and issued an order granting the motion and awarding prejudgment interest in the amount of $384,678.

---

[6] Code of Civil Procedure section 286 provides: "When an attorney dies, or is removed or suspended, or ceases to act as such, a party to an action, for whom he was acting as attorney, must, before any further proceedings are had against him, be required by the adverse party, by written notice, to appoint another attorney, or to appear in person."

On August 9, Harris filed a substitution of attorney, substituting Frank J. Lozoya IV in place of Pedersdotter.

*New Trial Motion*

As pertinent here, Harris filed a motion for new trial in which it argued a new trial should be granted because the trial court erred in severing the delay and impact damages after Spencer presented its case-in-chief, and then giving erroneous and ambiguous jury instructions that allowed the jury to consider damages other than damages for delay and impact. Harris also requested the court issue a remittitur under Code of Civil Procedure section 662.5, subdivision (b), to reduce damages from $1,000,000 to $803,000, as Spencer's witnesses admitted at trial they were seeking to recover only $803,000 in delay and impact damages. Finally, Harris asserted the trial court's order granting prejudgment interest was erroneous in part because Spencer "is not entitled to pre-judgment interest until such time as the complaint was filed. Civil Code § 3287(b) and *Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 72 (*Lewis C. Nelson & Sons*). Throughout pre-trial and trial [Harris] could not determine pre-judgment interest on its contingent unliquidated claim. In addition, under C.C.P. § 662.5(b)[,] the court should also disallow all prejudgment interest prior to the filing of Spencer's complaint."

Spencer opposed the motion. With respect to Harris's argument regarding prejudgment interest, Spencer argued Harris was asking the court to reconsider the unopposed motion without satisfying the requirements under Code of Civil Procedure section 1008 for a motion for reconsideration or justifying its tardiness in appointing replacement counsel, noting that Harris should have raised the argument that interest should have been calculated under section 3287, subdivision (b), in an opposition to the original motion. In its reply, Harris reiterated its argument that prejudgment interest can only be granted from the filing of the complaint.

16.

Following oral argument, the trial court took the matter under submission and subsequently entered a written order denying the new trial motion.

*Motion for Attorney Fees*

Spencer subsequently filed a motion for attorney fees pursuant to section 1717, based on an attorney fee provision in its subcontract with Harris. As relevant here, Spencer sought to recover $562,344.50 in fees incurred by its trial counsel, Flynn Williams, and $15,733 in fees and costs incurred by its prior counsel, McInerney & Dillon (McInerney). Harris opposed the motion, arguing Flynn Williams's fees should be reduced because it engaged in block billing, Spencer improperly included fees in its request that the parties had agreed in their settlement of the Change Order Claim Spencer would not recover, and it was impossible to tell from the invoice of McInerney whether that firm's fees were reasonable.

In reply, Spencer argued its fees were reasonable, the fees Spencer had forfeited were not included in its request, and an unredacted copy of McInerney's invoice, attached to a declaration of an attorney from Flynn Williams, showed the fees were reasonable. Harris filed an objection to the trial court's consideration of the unredacted invoice from McInerney.

Following oral argument on the motion, the trial court took the matter under submission. The trial court subsequently issued a written order reducing the fees requested by $20,865. A formal order was entered awarding Spencer $557,212.50 in attorney fees.

**DISCUSSION**

I.  Severance[7] and Jury Instructions

Harris challenges the trial court's decision to sever the delay claim from Spencer's other claims.  It is within the trial court's discretion to order severance or bifurcation of claims.  (*Royal Surplus Lines Inc. Co. v. Ranger Ins. Co.* (2002) 100 Cal.App.4th 193, 205.)  We review the trial court's ruling for abuse of that discretion.  (*Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1086.)  The trial court's "ruling will not be disturbed on appeal absent a manifest abuse of discretion." (*Ibid.*)  Here, the trial court decided to sever the delay claim from Spencer's other claims because the case was proceeding slower than anticipated and it wanted to ensure the trial would be completed within the timeframe set out at the beginning of trial.  The court reasoned it made more sense to proceed solely on the delay claim than the other claims, as that claim was the major portion of Spencer's case and its resolution could lead to a later resolution of the severed claims.  These were valid considerations and the court's decision to sever the claims was well within its discretion.

Harris does not contend otherwise.  Instead, Harris contends it was prejudiced by the timing of the trial court's order, made after Spencer had completed its case-in-chief, as Harris had no way to deal with Spencer's opening statement or "now 'irrelevant'" evidence Spencer had already presented to the jury.  Harris further asserts it was ordered not to revisit irrelevant facts, issues or testimony, and the severance order prevented it

_____

**7** As Spencer points out, while the trial court referred to "bifurcation" in ordering separate trials of the delay claim and the change order claim pursuant to Code of Civil Procedure section 1048, subdivision (b), the effect of the trial court's order was to sever these claims so separate trials could be held on them.  (See, e.g., *Bly-Magee v. Budget Rent-A-Car Corp.* (1994) 24 Cal.App.4th 318, 323 & fn. 5; Wegner, Fairbank, Epstein & Chernow, Cal. Prac. Guide: Civil Trials and Evidence (The Rutter Group 2012) ¶ 4:327 to 4:328, p. 4-81.)  Accordingly, we will refer to the court's ruling as severance rather than bifurcation.

from being able to rebut all of Spencer's claimed damage evidence, which went unopposed for the jury to consider.

Harris's argument, however, is completely devoid of any references to the record. Harris does not cite to where in the proceedings it was prevented from producing evidence or to facts that show the severance was prejudicial. It also does not cite to the evidence it claims it was unable to rebut. Without adequate citations to the record, we deem the argument forfeited. (*Duarte v. Chino Community Hosp.* (1999) 72 Cal.App.4th 849, 856; see also *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324 (*Nielsen*) ["On appeal, we must presume the trial court's judgment is correct. . . . [¶] . . . Thus, an appellant must not only present an analysis of the facts and legal authority on each point made, but must also support arguments with appropriate citations to the material facts in the record. If he fails to do so, the argument is forfeited."].)

Moreover, the trial court ameliorated any possible prejudice from the timing of the severance by telling the jury when it first made the decision that the only issue for the jury to decide was "whether Harris is legally responsible for some delay or delays to Spencer. That is, delays as far as Spencer is concerned and if so, what damages, if any, Spencer may have sustained." The court further explained the decision would take "certain issues" out of the case, allowing the case to get to the jury in time to finish it by the following Wednesday. While instructing the jury, the trial court gave the following special instruction: "The only issue[s] that you will be deciding in this trial are the issues of delay and any damages that may have been caused by the delay. I have removed certain other issues from this trial, as I have previously explained to you. The claims I have removed will be determined in later court proceedings. Do not speculate about the merits of the removed claims, nor discuss them in your deliberations." (Special Instruction No. 1.)

Harris contends this instruction was deficient because it failed to give the jury any direction as to what specific evidence, whether as to liability or damages, that it was not

19.

to consider as a result of the severance.  Harris also asserts the instruction was insufficient in light of other instructions given, which it contends were either erroneous, legally incomplete, or ambiguous.  Specifically, Harris contends the trial court erred in instructing the jury with (1) CACI No. 371 (Common Counts)[8] because delay damages are not recoverable under that theory, (2) CACI No. 3934 (Damages on Multiple Legal Theories)[9] because there was only one legal theory at issue, namely delay damages, and (3) CACI No. 303 (Breach of Contract –Essential Factual Elements)[10] because it did not specifically limit the type of damages to the delay claim and allowed Spencer to recover on a "non-delay impact claim, under different set of required elements th[a]n the three impact/delay instructions, and allowed different damages 'harm.'"[11]

---

[8] The jury was instructed with CACI No. 371 as follows:  "Spencer claims that Harris owes it[] money . . . for labor, equipment, materials and services provided.  To establish this claim, Spencer must prove all of the following:  One, that Harris requested, by words or conduct, that Spencer provide labor, equipment, materials and services for the benefit of Harris.  Two, that Spencer provided the labor, equipment, materials and services as requested.  Three, that Harris has not paid Spencer for the labor, equipment, materials and services.  Four, the reasonable value of the labor, equipment, materials and services that were provided."

[9] The jury was instructed with CACI No. 3934 as follows:  "Spencer seeks damages from Harris under more than one legal theory.  However, each item of damages may be awarded only once, regardless of the number of legal theories."

[10] The jury was instructed with CACI No. 303 as follows:  "To recover damages from Harris for breach of contract, Spencer must prove all of the following:  That Spencer and Harris entered into a contract.  That Spencer did all or substantially all of the significant things that the contract required it to do, or that it was excused from having to do those things[.]  [T]hat all conditions required for Harris[']s] performance had occurred[.]  [T]hat Harris failed to do something that the contract required it to do, and that Spencer was harmed by that failure."

[11] In making these arguments, Harris is operating under the misconception that a claim for delay damages constitutes a separate and distinct cause of action from breach of contract or common counts.  The term "delay damages," however, refers to consequential damages recoverable on a breach of contract claim that stem from the defendant's delay in performing its contractual obligations.  (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 906 [describing "delay damages" as "damages for delay in the

20.

Along with Special Instruction No. 1, Harris also complains about the following special instructions: (1) an instruction setting forth the findings the jury must make for Spencer to recover delay damages from Harris, which incorporates the elements of Public Contract Code section 7102 (Special Instruction No. 2);[12] and (2) an instruction which states that if the jury finds Harris impacted and delayed Spencer's work on the project, it must determine whether the delay caused Spencer "to incur costs that it would not otherwise have incurred except for the delay" (Special Instruction No. 3). Harris asserts Special Instruction No. 2 is incomplete because it does not have a damage element and Special Instruction No. 3 improperly fails to use the word "unreasonable" with regard to impact or delay, fails to state what damages may be recovered because of the delay, and uses the word "costs."

Harris asserts it was substantially prejudiced by the above CACI and special jury instructions because they were vague and ambiguous. Harris explains the "failure to clarify" what liability and damages evidence the jury could consider "left a substantial and huge ambiguity wherein the jury could (and given the verdict itself – did) speculate

commencement of the defendant's performance"]; accord *Lambert v. Superior Court* (1991) 228 Cal.App.3d 383, 389 [stating that mechanic's lien statute "does not permit a lien for delay damages," because "[t]he function of the mechanic's lien is to secure reimbursement for services and materials actually contributed to a construction site, not to facilitate recovery of consequential damages"].) Harris does not cite any authority to show that the delay damages sought in this case are not recoverable under the theories of breach of contract or common counts.

[12] The jury was instructed on this as follows: "In construction contracts involving public agencies, such as the Modesto School District contract, any provision in the contract, or any subcontracts, such as the subcontract between Spencer and Harris, prohibiting monetary damages for delay does not bar a subcontractor, such as Spencer, from recovering for damages for delay from a general contractor, such as Harris[,] . . . [i]f Spencer proves the following: One, the delay or delays were not within the contemplation of Spencer and Harris when the subcontract was executed. Two, Harris was responsible for the delay or delays. And, three, the delay or delays were unreasonable under the circumstances involved."

21.

as to what *liability* evidence was for impact/delay claims and what evidence was not[,] . . . [and] as to what *damages* evidence was for delay/impact claims and what damages evidence was not." Harris claims the "prejudice was obvious and substantial" given the trial court's use of a general verdict form that gave no direction to the jury on how to reach its verdict, and the severance coupled with the instructions resulted in a verdict that was greater than the delay damages Spencer's expert admitted at trial were $803,000. Harris reasons that, given the instructional errors, the jury was confused and improperly included $197,000 in damages that were not part of Spencer's delay damages.

A claim that the trial court gave an erroneous jury instruction is not reviewable on appeal where the appellant requested the particular instruction or a substantially similar one. Under the doctrine of invited error, a party in a civil case may not complain of error in instructions that it has requested. (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131; *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653-1655; 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 316, p. 369.) "The invited error doctrine is based on estoppel. '"Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal" on appeal.'" (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 706 (*Huffman*), italics omitted.)

Moreover, an appellant may not claim that a jury instruction correct in law was too general or incomplete, or lacked clarity, unless it requested an additional or qualifying instruction. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 948-949, disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4; *Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 520-521.) While under Code of Civil Procedure section 647 an appellant need not object to an erroneous instruction for purposes of appeal, this "'automatic exception' rule" does not apply where the instruction correctly states the law and the complaint is only that it is incomplete or too general. (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 304, p. 356.) In the absence of any indication

which party requested an instruction, we presume it was given at the appellant's request. (*Lynch v. Birdwell* (1955) 44 Cal.2d 839, 846-847; *Morehouse v. Taubman Co.* (1970) 5 Cal.App.3d 548, 559.)

Spencer contends that Harris is barred from challenging the CACI instructions on appeal because it requested each of these instructions. We agree. The record, augmented at Spencer's request with the instructions proposed by Harris and Spencer, shows that Harris proposed the CACI instructions which it now complains were given erroneously.[13] While Harris acknowledges it presented these instructions to the court, it argues the invited error doctrine does not apply because the instructions the court ultimately gave were those requested by Spencer, as shown by the jury instruction number at the top of the instructions included in the clerk's transcript as the "Instructions Given." This contention is meritless, as the invited error doctrine applies where the party asserting error acquiesces in a particular jury instruction. By proposing the exact same instructional language the court used, Harris acquiesced in the instructions and cannot complain about them on appeal. (See, e.g., *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000 [noting "numerous cases have held that a party who requests, or acquiesces in, a particular jury instruction cannot appeal the giving of that instruction"].)

Harris also contends the error is not invited because it submitted its proposed instructions before the trial court severed the delay claim from the other claims. Harris reasons that after the court ordered severance, not all of the instructions would be used, and asserts the court did not use Harris's proposed instructions because Harris withdrew them after the court issued the severance order. There is nothing in the record, however,

---

[13] While the Common Count instruction Harris proposed was labeled "CACI 373 (Modified)," the proposed language of that instruction mirrors verbatim the CACI No. 371 instruction the trial court gave.

to support the assertion that Harris withdrew its proposed instructions.**14** Jury instruction conferences were held both before and after the severance order, neither of which were reported. It was incumbent on Harris, as the appellant, to provide a record sufficient to support its claim of error. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 132.) Without a record of what occurred at the jury instruction conferences, we cannot presume that Harris withdrew the instructions. (*Faulk v. Soberanes* (1961) 56 Cal.2d 466, 471 [Explaining that the appellant "has the burden to present a record sufficiently complete to establish that the claimed errors were not invited by her, and in the absence of such a showing she may not properly complain."].)

This leaves the special instructions, which were not included in the packet of proposed instructions Harris or Spencer submitted. It is unclear from the record who drafted the special instructions. There is nothing on the special instructions themselves to indicate whether they were requested by either party, or whether the trial court proposed them on its own motion. It appears that a modified version of an instruction on delay and impact damages Spencer requested became the third special instruction Harris challenges. Since we cannot tell who requested the instructions, we may presume that Harris requested them.

---

**14** The record does show that after Spencer completed its case-in-chief, Pedersdotter told the court that, unless there was a dispute about whether a contract existed between the parties, Spencer's alternative causes of action for quantum meruit and common counts could be dismissed, so as not to confuse the jury with three types of damages. Spencer's counsel responded that would be right if Harris conceded the contract provided the basis for entitlement, but was concerned that the construction doctrine called "Cardinal Change" might apply to make the common counts causes of action relevant. However, in light of the evidence, Spencer's counsel was content to go with the breach of contract cause of action. The court, however, denied the motion at that point, because "they can do whatever they want in that regards," and advised counsel to give it some thought. The record is silent on whether any subsequent discussion occurred on this issue or whether Pedersdotter lodged further objections regarding the common counts claim.

24.

But even if Harris did not request the instructions, its claim of error fails because there is nothing in the record to show that Harris requested clarification of the instructions. Harris's complaints about these instructions are not that they incorrectly state the law, but rather that they are incomplete and confusing. As we have already stated, Harris contends: Special Instruction No. 1 is deficient because it fails to specify the evidence of liability and damages it could consider after the severance; Special Instruction No. 2 is incomplete because it fails to include a damage element; and Special Instruction No. 3 fails to use the word "unreasonable" with respect to delay or impact, or state what damages may be recovered, and uses the word "costs." The substance of Harris's argument is that the jury instructions needed to be clarified because they would confuse the jury. Harris cites absolutely no legal authority to show that any of these instructions contained incorrect statements of the law. It is Harris's burden to present adequate argument and legal authority on each point raised. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*); *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 (*Guthrey*); *Muega v. Menocal* (1996) 50 Cal.App.4th 868, 877 (*Muega*).) Absent a request for clarification from Harris, which is not apparent on this record, the issue is not preserved for review.

Finally, Harris also asserts the verdict form contributed to the prejudice from the severance order. Harris contends the court erred in refusing to use a special verdict form. Although Harris recognizes a special verdict form was not required, it asserts the court should have used one to allow the jury to "fix the proper liability and damages 'caused' by the alleged 'unreasonable' delay."

The argument is frivolous. Although in its brief Harris states the court refused to use a special verdict form, there is no indication *in the record* of any such refusal or that Harris objected to the verdict form that ultimately was used. Furthermore, there is no suggestion that Harris proposed a special verdict form – there is not one in the record.

25.

And finally, Harris cites absolutely no law for its proposition that a special verdict form was required under these circumstances.

## II. Evidentiary Issues

Harris raises two evidentiary issues on appeal. Harris contends the trial court erroneously applied its order precluding Harris from offering expert testimony when it sustained Spencer's objections to testimony Harris claims was regarding percipient events, thereby resulting "in a broad elimination of evidence under the alleged umbrella of 'expert testimony.'" Harris also contends the trial court erred in ruling in limine that Spencer's experts could testify whether any delay by Harris was reasonable or unreasonable.

We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1419.) A trial court does not abuse its discretion unless it acts in an arbitrary, capricious or patently absurd manner. (*Ibid.*)

A judgment or order cannot be reversed based on the erroneous admission or exclusion of evidence unless the appellant shows that there was a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354; Cal. Const., art. VI, § 13.) "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Huffman, supra,* 121 Cal.App.4th at p. 692.)

The burden is on the appellant to establish both an abuse of discretion and a miscarriage of justice. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) "'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate

26.

practice but an ingredient of the constitutional doctrine of reversible error.'" (*Id.* at p. 564.)

We begin with the exclusion of expert testimony. Harris does not contend the trial court erred in its ruling before trial which barred Harris from offering any expert testimony due to its failure to disclose expert witnesses. Instead, Harris asserts the trial court misapplied the order by excluding percipient witness testimony during trial, thereby depriving it of "offering all the material and relevant testimony regarding what [its] own percipient witnesses perceived, did and analyzed as well as what conduct they engaged in regarding how the Project was run, what Spencer did, and how [it] dealt with Spencer's subsequent claim."

In support of its argument, Harris cites cases in which witnesses were permitted to testify regarding their observations and, in some cases, to give an opinion based on those observations. (See *People v. Chatman* (2006) 38 Cal.4th 344, 374-376 [trial court properly precluded psychologist who administered psychological testing to a prosecution witness to determine her credibility from testifying about the test results and his opinion, although he was permitted to testify that he administered the tests]; *People v. Hinton* (2006) 37 Cal.4th 839, 889 [noting, without deciding, that police officer's opinion testimony based on his observations of the defendant's conduct was admitted properly if it was helpful to a clear understanding of his testimony]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1308-1309 [lay witnesses could testify regarding their observations of the defendant's conduct and their opinion based on those personal perceptions]; *Manney v. Housing Authority of City of Richmond* (1947) 79 Cal.App.2d 453, 459-461 [expert permitted to testify on cause of fire].) Harris also asserts that where there is a dispute between parties to a contract regarding the meaning of a contract term, the parties' conduct after the execution of the contract is admissible to ascertain their intentions, citing *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1449-1450.

27.

While Harris argues generally from these cases that the trial court erred in excluding "substantial highly material percipient witness testimony" regarding various subjects, it fails to offer any argument on specific testimony it claims the court erroneously excluded. Instead, Harris lists a lengthy string of citations to the reporter's transcript without explanation or argument.

It is an appellant's burden to establish error through reasoned arguments, not conclusory assertions. (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1215 ["Contentions are waived when a party fails to support them with reasoned argument."]; cf. *Federation of Hillside and Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265 [rejecting argument raised in conclusory fashion].) We need not consider points unsupported by legal analysis or authority. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 (*Badie*); *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672–673, fn. 3.) Nor need we consider points supported by citation to general legal principles or legal authority without application of those principles or authorities to the case at hand. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699 ["plaintiffs ... cit[e] only general principles governing [reconsideration] ... motions without applying those principles to the circumstances before the court"].) "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived [forfeited]." (*Badie, supra,* 67 Cal.App.4th at pp. 784–785.)

Harris fails to meet its appellate burden. Harris cites general principles concerning the admission of lay testimony and opinion, but utterly fails to explain how those principles apply to the specific testimony it claims the trial court erroneously excluded. Harris does not analyze particular questions, objections or rulings. Although Harris lists approximately 52 excerpts of testimony from the reporter's transcript, citing only the page and line numbers, it makes no coherent legal argument relevant to any particular

28.

ruling. We thus conclude Harris forfeited its argument regarding the exclusion of percipient witness testimony on appeal. (*Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)

Harris does not fare much better in its assertion the trial court erroneously allowed Spencer's expert witnesses to render their opinions concerning the reasonableness of Harris's delay. Harris asserts the trial court's in limine ruling on this issue improperly permitted the experts to give opinion testimony on ultimate issues. In support of this argument, Harris cites cases which state or apply the legal principle that experts may not opine on pure questions of law. (See, e.g., *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178; *Devin v. United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1158 fn. 5 [expert could not opine on legal issues such as the interpretation of an insurance policy's scope or whether an insured reasonably could expect a defense under the policy]; *Ferreira v. Workmen's Comp. Appeals Bd.* (1974) 38 Cal.App.3d 120, 125-126 [physician's statement in his report that the insurance company should not be held liable for the plaintiff's injury because it was not industrially related was a legal conclusion not subject to expert opinion].)

Spencer contends we must reject this argument because Harris did not object to the admission of such testimony in the trial court. We agree Harris has forfeited this challenge by failing to make an objection below that satisfies the requirements of Evidence Code section 353.[15] (*SCI Cal. Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563-565; see also *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 725-726.) As Spencer points out, Harris has not presented a single

---

[15] Evidence Code section 353 provides in relevant part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion ...."

citation to the record showing it objected to the introduction of testimony by Spencer's expert witnesses.

Harris contends it preserved its right to challenge the testimony because it objected in argument during an in limine motion, citing the general rule that in certain situations an objection made during in limine motions can satisfy the requirements of Evidence Code section 353 and thereby preserve appellate review of the issue. (*People v. Morris* (1991) 53 Cal.3d 152, 189, disapproved on another point by *People v. Stansbury* (1995) 9 Cal.4th. 824, 830 fn. 1; *Sacramento and San Joaquin Drainage Dist. v. Reed* (1963) 215 Cal.App.2d 60, 67-68.) In the portion of the reporter's transcript Harris cites to, however, there is no objection lodged by Harris's counsel. The court and counsel were discussing Spencer's motion to preclude Harris from offering testimony that Spencer could not recover delay damages under the subcontract. While Harris's counsel argued that Harris should be allowed to present evidence that it relied on the no-damages-for-delay clause, she never objected to, or disagreed with, the court's statements that an expert could testify regarding whether the delay was "'reasonable'" or "'unreasonable,'" or that it was for the court to interpret the clause for the jury. Without a specific objection on that ground, the argument is forfeited.

The argument also is forfeited because it is conclusory without meaningful legal analysis. Harris cites general principles concerning the limits of expert opinion, but completely fails to explain how those principles apply to the specific testimony it claims the trial court should not have admitted. Harris does not analyze particular questions, objections or rulings. Although Harris lists approximately 27 excerpts of testimony from the reporter's transcript, citing only the page and line numbers, it makes no coherent legal argument relevant to any particular testimony or ruling. We thus conclude Harris forfeited its argument regarding the admission of expert testimony on appeal. (*Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)

Moreover, even assuming the trial court erroneously excluded or admitted evidence, Harris fails to present facts or legal support, or make any reasoned argument, to substantiate its assertion that it was prejudiced by these purported errors. Accordingly, it did not meet its burden of showing there was a miscarriage of justice resulting from the trial court's evidentiary rulings.

III. Judicial Bias

Harris contends the trial transcript reveals that the trial judge regarded its trial counsel, Pedersdotter, "in a most negative fashion" and "did not portend to hide or minimize its negative and biased feelings" toward her. Harris asserts the judge made these feelings clear to the jury in both his "regular stream of rulings" against Harris and his negative comments, thereby undermining Harris's position with the jury throughout the trial. Harris cites to five passages from the trial transcript to support its contention that reversal is warranted.

On the fourth day of trial, during Pedersdotter's cross-examination of Bonar, the judge suggested she point out the paragraph rather than have Bonar read the entire subcontract; told her how to mark a defense exhibit; advised her to "forget all the chatter here and just ask questions and go on or we'll be here all day chattering about things"; asked if there was "a question in there someplace" as she was making speeches; and again told her to refer to the specific provision in the subcontract she wanted Bonar to review. Thereafter, outside the jury's presence, Pedersdotter told the judge she felt his instructions to her were excessive, belittling, and undermined her authority in front of the jurors. The judge said he was not belittling her in front of the jury and explained he was trying to get her to do what she was supposed to do, such as to ask direct questions and not make speeches or chatter, and even when he made suggestions, she did not correct the problems. The judge denied berating her or being mad at her; instead, he was doing his job of stopping improper questioning.

31.

On the sixth day of trial, a conference was held outside the jury's presence at Pedersdotter's request. Pedersdotter was concerned about the tenor of the judge's communications with her and her client versus opposing counsel and his client. She complained that the judge had openly expressed "tremendous impatience and unhappiness" with her; when her client was on the stand that day, the judge interrupted him and "chastised him"; she and her clients were concerned the judge was communicating something to the jury; the judge was quick to "cite numerous reasons" why defense exhibits should be kept out in a "greatly unpleasant" way; and she was concerned the totality of these instances, and what she and her client perceived to be the "growing animosity" toward Harris, threatened to undermine Harris's right to a fair trial. Spencer's counsel said he disagreed with everything Pedersdotter said.

The judge then asked Harris's witness, Tim Marsh, whether he thought the court was chastising him when it made a comment to him during his testimony; Marsh answered "No. I'm new with this." The judge admitted having a difficult time with Pedersdotter due to her speeches, gratuitous comments, leading of witnesses, and her inability to accept the judge's ruling excluding expert testimony and the instruction to the jury on the no-damages-for-delay clause, both of which she kept trying to get around. Pedersdotter responded it was obvious the judge disliked how she conducted herself in the courtroom and she believed his personal feelings were coming out in front of the jury. Pedersdotter said she would try not to commit more infractions and insisted the judge express his criticisms and dislike outside the jury's presence. The judge responded that he had been fair to her and her client, and the transgressions she was talking about were hers.

At the beginning of trial the following day outside the jury's presence, Pedersdotter reargued the effect of the ruling excluding expert testimony. The judge pointed out she was relying on an overruled case. Pedersdotter said she could cite other cases and asked if she could finish. The judge said she could. Pedersdotter responded,

32.

"But you're shrugging your shoulders and you are exhibiting – as I typically see, you announce your impatience and your lack of interest in whatever I have to say. So please –" The judge interjected, "I find you to be very discourteous, but go ahead. Go ahead. I'm listening to you." Pedersdotter complained that the rulings on expert testimony had taken away Harris's ability to defend itself. She further complained that her client was convinced there was a double standard in the case as to the court's rulings and asked how this could be a fair trial. She said "three client persons" who were in the courtroom the previous day all observed that when the judge began to "dress me down in front of them, the jury began laughing." The judge responded that this was not the first time she had argued this, he was confident of his ruling on the expert witness issue, and no further argument was required because he was not going to change his mind. Pedersdotter moved for a mistrial, which the judge denied.

At the lunch break on the tenth day of trial, which the judge set aside to discuss with counsel his proposal to sever Spencer's case, Pedersdotter explained her opposition to the proposal. She then began to reargue the expert testimony issue. The judge interrupted her, stating they were not there to discuss that issue, which had been discussed at least ten times. When Pedersdotter said she understood that, he told her to "be quiet about that." Pedersdotter continued to argue on the subject; the judge warned her, "Counsel, we're done on that. We're done. Be quiet. Be quiet. I'll hold you in contempt. I don't want to do that. But when I tell you to be quiet, be quiet. We have other issues we've got to decide. We're not going to go back to decide every issue that's ever occurred in this case – " When Pedersdotter interrupted to ask if she could have "60 seconds[,]" the judge responded, "Be quiet. I don't want to hold you in contempt, but I will if you don't start obeying. You disobeyed every order I've given in this case."

Judicial misconduct merits reversal of a civil judgment when it has been shown to be prejudicial as a miscarriage of justice, or intentional and sufficiently heinous to warrant reversal as a punishment or because it reveals bias on the part of the court.

33.

(*Mathew Zaheri Corp. v. New Motor Vehicle Bd.* (1997) 55 Cal.App.4th 1305, 1314-1315.)  Harris contends the above passages show the trial court was overly critical of its trial counsel and conveyed that bias to the jury.  While these passages, the majority of which occurred outside the jury's presence, show the court was exasperated with defense counsel, it appears the genesis of the court's actions and comments was defense counsel's failure to follow the court's rulings and directions.  As Spencer points out, the record shows the trial court, in acting as it did, was exercising reasonable control over the presentation of evidence to provide the orderly conduct of the proceedings.  (Code Civ. Proc., § 128, subd. (a)(3); Evid. Code, § 765.)

Harris has not established a miscarriage of justice, intentional or heinous misconduct, or partiality or bias on the part of the trial court.  Nor does the record in this case reveal conduct comparable to the criminal cases on which it relies, *People v. Brock* (1967) 66 Cal.2d 645, 649, 655-656 [trial judge instructed jury that, in his opinion, the defendant's guilt was established beyond a reasonable doubt], overruled on another point by *People v. Cook* (1983) 33 Cal.3d 400, 413 fn. 13, *People v. Perkins* (2003) 109 Cal.App.4th 1562, 1567 [trial judge's examination of the defendant was intemperate, the judge acted as though he sided with the People and he prejudicially interfered with the defense], and *People v. Flores* (1971) 17 Cal.App.3d 579, 583-585 [court erred in making comments to jury, when advised the jury was divided, regarding the evidence, the credibility of witnesses and its convictions as to the defendant's guilt].

Finally, absent exceptional circumstances, comments of the trial judge will not amount to reversible error, particularly where the jury was admonished to disregard the comment.  (*Aguayo v. Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 1032, 1043; *Mercado v. Hoefler* (1961) 190 Cal.App.2d 12, 23-24 [no prejudice from trial judge's comment during trial that the appellants were partners where the judge admonished the jury that his statement did not constitute evidence and they were to consider only the witnesses' testimony, and instructed the jury that it was the sole trier of fact].)  Here, the

34.

judge specifically instructed with CACI No. 5000, which states in part: "You must decide what the facts are. You must consider all the evidence and then decide what you think happened. You must decide the facts based on the evidence admitted in this trial. . . . [¶] In reaching your verdict, do not guess what I think your verdict should be from something I may have said or done." The conduct of the trial judge does not warrant reversal.

IV. Damages

Harris contends the trial court erred by denying Harris's motion for new trial, or alternatively remittitur, on the issue of damages. Harris argues the court should have granted a new trial on damages or issued a remittitur under Code of Civil Procedure section 662.5, subdivision (b) reducing the judgment from $1,000,000 to $803,000, because Spencer "admitted at trial" that its delay and impact damages were $803,000. Harris asserts these admissions were made by Spencer's expert, who quantified the delay damages as $803,000, and its president, Bonar, who testified Spencer was "sticking with" the expert's figure of $803,000. Without citation to any relevant authority, Harris asserts Spencer's admission that the impact claim was $803,000 is "binding substantial evidence" that requires reduction of the judgment to that amount pursuant to Code of Civil Procedure section 662.5, subdivision (b).[16]

If a trial court grants a new trial on the ground of excessive damages, it has discretion to issue an order conditionally granting the new trial unless the party in whose favor the verdict was rendered consents to a reduction of damages. (Code Civ. Proc.,

---

[16] The sole case Harris cites in this section of its opening brief, *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, provides no guidance on an appeal from a denial of a motion for new trial on excessive damages, as *Horsford* involved an appeal from an order conditionally granting a new trial unless the plaintiffs consented to a remittitur of excessive damages; the decision did not address appellate review of denials of new trial motions based on excessive damages or whether testimony at trial constitutes a binding admission. (*Id.* at pp. 372, 379, 386-390.)

§ 662.5, subd. (a)(2).)[17]  On a motion for new trial claiming excessive damages or insufficient evidence (Code Civ. Proc., § 657, subds. 5-6), the trial court sits as an independent trier of fact.  (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412.)  If the motion is granted, we apply a "highly deferential standard" (*id.* at p. 409), upholding all factual determinations with "the same deference that an appellate court would ordinarily accord a jury's factual determinations" (*id.* at p. 412); pertinent evidentiary conflicts place the new trial order "beyond review" (*id.* at p. 416).  A denial of the motion, on the other hand, requires deference to the jury verdict, as in any claim of insufficient evidence.  We affirm if any substantial evidence, contradicted or uncontradicted, supports the judgment.  (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 (*Western States*).)

In our review of the evidence: "'[A]ll conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in to uphold the [finding] if possible.  It is an elementary, but often overlooked principle of law, that when a [finding] is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [finding].  When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'"  (*Western States, supra,* 9 Cal.4th at p. 571, quoting *Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429.)  The same is true for a damages award; we affirm if the record, viewed most favorably to the award, discloses

_____

[17] In its argument, Harris cites to Code of Civil Procedure section 662.5, subdivision (b), rather than section 662.5, subdivision (a)(2).  Section 662.5, subdivision (b) provides:  "If a deadline for acceptance or rejection of the addition or reduction of damages is not set forth in the conditional order, the deadline is 30 days from the date the conditional order is served by the clerk of the court.  Failure to respond to the order in accordance with this section shall be deemed a rejection of the addition or reduction of damages and a new trial limited to the issue of damages shall be granted automatically."

36.

substantial evidence to support it. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 746.)

This review necessarily places a burden on an appellant: "'[A] reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings.'" (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.) A recitation of only the appellant's evidence does not suffice. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman & Clark Corp.*).) An attack on the evidence without such briefing is entitled to no consideration when it is apparent that a substantial amount of evidence was received on a respondent's behalf. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) "It is neither practical nor appropriate for us to comb the record on [an appellant's] behalf." (*In re Marriage of Fink, supra,* 25 Cal.3d at p. 888.)

Harris attacks the damages award on the basis of the trial testimony of Spencer's president, expert and CEO regarding the amount of delay damages. Harris asserts Spencer is bound by testimony that it was seeking $803,000 in delay damages at trial. Harris, however, cites absolutely no legal authority in support of its contention that such trial testimony constitutes what it terms "*binding substantial evidence*" that requires reduction of the damage award from $1 million to $803,000. By failing to cite any legal authority, Harris has not satisfied its appellate burden to present adequate argument and legal authority, and we may summarily reject its claim of error. (*Stanley*, *supra*, 10 Cal.4th at p. 793; *Guthrey*, *supra*, 63 Cal.App.4th at p. 1115; *Muega*, *supra*, 50 Cal.App.4th at p. 877.)

Moreover, as Spencer points out, the testimony Harris points to does not constitute binding judicial admissions. A "judicial admission" – generally distinguished from an

"evidentiary admission" – is an admission of fact by a party that is treated as a "'*waiver of proof*,'" in that the admission is taken to establish the fact conclusively. (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271-1272; see also *Troche v. Daley* (1990) 217 Cal.App.3d 403, 409 [a ""'judicial admission is not merely evidence of a fact; it is a conclusive concession of the truth of a matter which has the effect of removing it from the issues. . . . "'"']; *Walker v. Dorn* (1966) 240 Cal.App.2d 118, 120.) The testimony to which Harris cites, such as Anderson's calculation of delay damages at $803,113 and Bonar's testimony that he calculated delay damages of $870,000, are not clear concessions that Spencer was entitled to recover only $803,000. Instead, Bonar testified that Spencer's damages were much greater than the $803,000 in delay damages Anderson calculated and the $870,000 it asked Harris for before filing this lawsuit. It is apparent from the trial testimony on damages that Spencer, through its witnesses, was telling the jury that while its damages exceeded $1 million, it was asking only that the jury award the lower figure. In no way was the testimony of Spencer's witnesses a judicial admission that its delay damages totaled only $803,000.

Harris contends that because the $1 million jury award exceeded the amount of delay damages testified to by Bonar ($870,000) and Anderson ($803,000), it necessarily included an award for the unpaid change orders that were severed from this trial. In making this argument, Harris essentially is contending the delay damages the jury awarded are not supported by substantial evidence. Harris, however, fails to recite all of the material evidence on delay damages, thereby forfeiting review of the purported error. (*Foreman & Clark Corp.*, *supra*, 3 Cal.3d at p. 881.)

Alternatively, our review of the record shows there was substantial evidence to support the jury's award of $1 million for Spencer's delay and impact damages. As Spencer's counsel explained during closing argument, there were three different ways to calculate the delay damages in the case, all of which had been presented to the jury: (1) Anderson's calculation of $803,113, (2) Bonar's calculation of $870,000, and

(3) $1,112,018, which is what Anderson calculated Spencer paid out of pocket for labor, materials and subcontractors, which was exclusive of any markup Spencer planned to make on the Project. There was testimony to support each of these figures. The jury was instructed that if it found Harris "impacted and delayed" Spencer's work on the project, it was required to determine whether that delay caused Spencer "to incur costs that it would not otherwise have incurred except for the delay." In deciding the value of the additional costs Spencer incurred due the impacts of Harris's delays, the jury chose to award Spencer $1 million, which is close to the out-of-pocket loss of $1,112,018 less the $120,787 Bonar testified Spencer was owed on the change orders. Harris does not argue that out-of-pocket cost is an incorrect measure of delay damages. Substantial evidence supports the jury's determination that Spencer's delay damages, without regard to the change order claim, were $1 million.

It is true, as Harris points out, that an appellate court may reverse an award of damages "[w]hen the award, as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, . . . " (*Cunningham v. Simpson* (1969) 1 Cal.3d 301, 308-309.) Here, the award was not excessive or disproportionate to the claimed delay damages, and therefore does not raise a presumption the award resulted from passion or prejudice. (*Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 465-466.)

V. Prejudgment Interest

In granting Spencer's post-trial motion for prejudgment interest, the trial court awarded Spencer prejudgment interest pursuant to section 3287, subdivision (a), which provides, in pertinent part: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . .". Prejudgment interest is allowable under section 3287, subdivision (a), "'where the amount due plaintiff is fixed by the terms of the contract, or is readily ascertainable

39.

by reference to well-established market values.  [Citations.]  On the other hand, interest is not allowable where the amount of the damages depends upon a judicial determination based on conflicting evidence.'"  (*Great Western Drywall, Inc. v. Roel Construction Co., Inc.* (2008) 166 Cal.App.4th 761, 767.)  Prejudgment interest is an element of compensatory damages, which compensates the injured party for loss of use of the money during the prejudgment period.  (*Id*. at pp. 767-768.)

Although Harris did not file an opposition to Spencer's motion, it raised the propriety of the award under this subdivision in its motion for a new trial, which the trial court denied.  On appeal, Harris contends the trial court erred in awarding prejudgment interest under this subdivision because Spencer's delay damages both were uncertain and incapable of being made certain by calculation.

We first address Spencer's contention that Harris does not have "standing" to contest the ruling because it did not oppose the motion or seek reconsideration.  Without citation to authority, Spencer contends Harris "forfeited and waived" its opportunity to contest the award of prejudgment interest.  We disagree, as Harris raised the issue of the amount of the award in its motion for a new trial.  Since prejudgment interest is an element of damages and may be sought as part of a motion for new trial on the ground of inadequate damages, it follows the award of prejudgment interest may be challenged in a motion for new trial on the ground of excessive damages.  (See *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 830; Code Civ. Proc., § 657, subd. 5.)  That is precisely what Harris requested in its new trial motion, namely reduction of the prejudgment interest previously awarded.

Whether section 3287, subdivision (a) applies to a particular action is a question of law that we review de novo.  (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 956.)  However, where the facts are in dispute as to whether damages are "liquidated" so as to entitle a party to prejudgment interest under that section, we review the court's determination under the substantial evidence standard of

40.

review.  (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)

Here, Spencer sought prejudgment interest under section 3287, subdivision (a) on the ground that its delay and impact costs were certain or capable of being made certain by calculation when Spencer submitted to Harris its claim for payment in the amount of $870,969.20 on December 21, 2006.  In granting the motion based on subdivision (a), the trial court impliedly agreed.  This implied finding, however, is not supported by substantial evidence.

"'The test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount. [Citation.]'  [Citations.] 'The statute [Civil Code section 3287] does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, "depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor."  [Citations.]' [Citation.]  Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate."  (*Wisper Corp. v. Cal. Commerce Bank* (1996) 49 Cal.App.4th 948, 960 (*Wisper Corp.*).)

The evidence in this case shows that the delay damages claimed in Bonar's December 2006 letter were an estimate, and the damages were uncertain and incapable of being made certain within the meaning of section 3287, subdivision (a).  Bonar testified that he sent Harris the December 21, 2006 letter to update Harris on Spencer's estimated costs incurred due to the delays.  When asked how he arrived at his first estimate of delay costs in June 2006, Bonar explained that how he came up with the number was not an "exact science"; he took the hourly cost for certain managers and a superintendent, along with fixed costs, and extended them out 120 days, and then used an "efficiency factor[,]" to reach a very conservative number.  In determining the December 2006 number, Bonar

started with the June 2006 estimate, changed the number of workers to reflect what actually happened and added punch list items.

Bonar admitted the December 2006 number was an estimate, explaining that it is "very, very difficult in a time extension claim or impact claim to determine exactly the number of extra hours that you spent. It's virtually impossible." Bonar further explained the calculation was based on an estimate of the impact of the time and the access of the out-of-sequence work. It was not based on the number of hours spent on the project, as this "was not a total cost claim."

Spencer's expert, Anderson, testified he believed Bonar's December 2006 claim was "reasonable and adequate for the purposes of setting forth their damages." He also believed the number was an estimate. Anderson explained it fell within seven percent of his calculations and "[i]f you sat four other experts down here in this seat, they would have four different other numbers. You're not going to come to the same number."

Thus the testimony of Bonar and Anderson establishes that the December 2006 delay damage figure was an estimate, it was "virtually impossible" to quantify the extra hours upon which the figure was based, and no two people would come up with the same figure. The letter itself shows the uncertainty of the amount claimed, as it states it is an estimate which was based on a "conservative method," Bonar encouraged Harris to call to discuss rather than to demand it to pay a sum certain, and the figure was not fixed, as Bonar stated Spencer had incurred costs due to "lack of flow" and "efficiency factors," which would follow.

Where damages cannot be ascertained by calculation, prejudgment interest may not be awarded under section 3287, subdivision (a). (*MacIsaac & Menke Co. v. Cardox Corp.* (1961) 193 Cal.App.2d 661, 673 (*MacIsaac*).) *MacIsaac* is instructive. There, a subcontractor was not paid for extra work it performed on a project pursuant to an oral modification of the original subcontract. (*Id.* at pp. 664-665.) After finding that the contractor was liable to the subcontractor for the extra work, the trial court awarded the

subcontractor the reasonable cost of the work actually performed under the existing circumstances and conditions. (*Id.* at p. 671.) The trial court ultimately determined the subcontractor was not entitled to prejudgment interest on the unpaid amount. (*Id.* at p. 672.)

The Court of Appeal affirmed, noting that the additional work was not performed under normal conditions, as there were delays, changes and deviations that substantially increased the cost of performance and were not subject to computation. (*MacIsaac*, *supra*, 193 Cal.App.2d at p. 673.) The appellate court further explained the extent to which the delays and interruptions added to the cost of the work could only be ascertained by a judicial determination, arrived at from a consideration of all the conditions under which the work was done. (*Id.* at p. 673.) Since the amount of damages awarded did not represent what the work would have cost under normal conditions, the cost of the work could not be ascertained by computation and rendered section 3287, subdivision (a) inapplicable. (*Id.* at p. 673.) Similarly, in *Macomber v. State of California* (1967) 250 Cal.App.2d 391, where the plaintiff was entitled only to the reasonable value of the extra work performed, before trial the value was based only on the plaintiff's estimate, and the details of the cost breakdown could only be determined after cross-examination, prejudgment interest was improper because damages could only be ascertained by the trial court after consideration of conflicting evidence. (*Id.* at p. 401.)

Here, the evidence showed that the delay damages Spencer claimed in Bonar's December 2006 letter could not be ascertained by computation as they were based on estimates the accuracy of which was "virtually impossible" to determine. Spencer contends the delay damages were capable of being made certain because the letter supplied the data necessary for Harris to determine the amount due, citing *Maurice L. Bein, Inc. v. Housing Authority of the City of Los Angeles* (1958) 157 Cal.App.2d 670 (*Bein*). In *Bein*, a general contractor who had contracted with the Housing Authority to

43.

build a low-rent housing complex sued for damages arising from a delay caused by the Housing Authority. (*Bein*, *supra*, 157 Cal.App.2d at pp. 674-675, 678.) The Court of Appeal held the contractor was entitled to prejudgment interest because, from the inception of its claim for damages, it had supplied the Housing Authority with detailed statements of the data necessary to determine the amount due and the Housing Authority never actually denied the damages claimed. (*Id.* at pp. 686-687.)

In contrast to *Bein*, in this case Spencer did not supply Harris with invoices from which it could calculate the delay damages. Instead, it submitted Bonar's estimation of its delay damages, which he admitted was not an "exact science" and it was "virtually impossible" to determine the extra hours since the claim was not a total cost claim. Spencer asserts Harris did not dispute its calculation of the delay damages because it did not present any testimony rebutting Bonar's and Anderson's computations. Harris, however, did urge the jury in its closing statement to reject both Anderson's calculation as unreliable and Bonar's estimate as Harris was never provided backup to substantiate the amount claimed in the December 2006 letter. Spencer does not point to any invoices or other documents it submitted to Harris from which Harris could itself determine by calculation the delay damages. For that reason, Spencer's reliance on *Bien* is misplaced.

The policy underlying the requirement for prejudgment interest "is that in situations where the defendant could have timely paid that amount and has thus deprived the plaintiff of the economic benefit of those funds, the defendant should therefore compensate with appropriate interest." (*Wisper Corp.*, *supra*, 49 Cal.App.4th at p. 962.) This is not such a case. Spencer did not present a clear and unequivocal statement of damages and Spencer's own expert tested that no two experts would come to the same valuation as his. Given these facts, we conclude that the court erred in determining that Spencer's damages were certain or capable of being made certain prior to the jury's determination. The trial court should have granted a new trial on the issue of prejudgment interest.

44.

The issue, then, is the remedy. In moving for prejudgment interest in the trial court, Spencer alternatively requested the court exercise its discretion to award prejudgment interest under section 3287, subdivision (b), which provides "[e]very person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." Subdivision (b) creates "a limited exception to the prevailing general rule that prejudgment interest is not allowed on unliquidated obligations." (*Lewis C. Nelson & Sons, supra,* 90 Cal.App.4th at p. 69.) By its terms, subdivision (b) "was designed to allow trial courts flexibility in circumstances . . . where the exact amount of damage is in dispute." (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 496.) Spencer asked the court to award prejudgment interest under this subdivision on the one million dollar jury verdict from the date the complaint was filed to May 2011.

Harris contends Spencer is barred from recovering prejudgment interest under subdivision (b) because the trial court specifically denied Spencer's request for prejudgment interest under subdivision (b) in its order granting the motion under subdivision (a). The record, however, does not support this assertion, as the court's minute order does not specify under what subdivision the motion was granted and its written order, while stating that Spencer's "motion for an order awarding it prejudgment interest is granted in the amount of $384,678[,]" does not state that it denied, or would have denied, the motion under subdivision (b).

Spencer contends the trial court could have awarded $341,667 in prejudgment interest under subdivision (b), calculated on the jury's verdict from the date of complaint. Significantly, in moving for a new trial on prejudgment interest, Harris did not argue that prejudgment interest should not be awarded at all. Instead, Harris argued, citing subdivision (b) and *Lewis C. Nelson & Sons*, that Spencer only was entitled to

45.

prejudgment interest from the date the complaint was filed, as the damages were unliquidated. Harris presented no argument below, and makes none in its opening brief on appeal, that Spencer should not be awarded prejudgment interest under subdivision (b). While Harris makes a passing statement in its reply brief that there is no basis to award interest, it presents no argument and cites no authority in support of this assertion. Since Harris essentially conceded that the trial court should award prejudgment interest under subdivision (b), we will order the prejudgment interest in the judgment be reduced from $384,678 to $341,667.

VI. Attorney Fees

Harris challenges the amount of attorney fees the trial court awarded. Specifically, Harris asserts the trial court (1) was required to reduce the fees of Spencer's attorneys, Flynn Williams, because the majority of their bills contained block billing, (2) should have stricken fees requested from September 13 to November 9 based on the parties' settlement agreement regarding the change order claims, and (3) should have disallowed fees for Spencer's prior counsel, McInerney, because their time records were incomplete and not supported by a declaration.

The standard of review of an award of attorney fees after trial is abuse of discretion. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.) The trial judge is considered the best assessor of the value of professional services in his or her court. (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 148.) As a result, the decision will not be disturbed unless it is shown that it is clearly wrong or is inconsistent with applicable legal principles. (*Ibid.*) "In challenging attorney fees as excessive because too many hours of work are claimed, it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence. General arguments that fees claimed are excessive, duplicative, or unrelated do not suffice." (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.)

46.

An appellate court will reverse an award of attorney fees as excessive only where there has been a manifest abuse of discretion. (*EnPalm, LCC v. Teitler Family Trust* (2008) 162 Cal.App.4th 770, 774.) Reasonable attorney fees authorized by contract shall be awarded to the prevailing party as "fixed by the court," giving the trial court broad discretion to determine the amount considered reasonable, governed by equitable principles. (*Ibid.*) The pleadings, pretrial motions, and other evidence of actual work performed by Spencer's attorneys are before the court, and upon this evidence, the court alone has the discretion to set the fee award. (*Melnyk v. Robledo* (1976) 64 Cal.App.3d 618, 624.)

In some instances, an award of attorney fees may be made solely on the basis of the experience and knowledge of the trial judge without the need to consider any evidence. (*Fed-Mart Corp. v. Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 226.) Moreover, it is well established detailed billing records are *not* required to affirm an attorney fees award. "In California, an attorney need not submit contemporaneous time records in order to recover attorney fees .... Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records." (*Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559; see also *Steiny & Co., Inc. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 293.)

We begin with the block billing. Many of the billing statements from the law firm Flynn Williams that Spencer submitted as part of its supporting evidence were in block or daily billing format. If an attorney performed multiple tasks on the case on a single day, the billing statement lists the tasks performed and the total time spent by the attorney on all legal services performed on that day, but does not specify the time spent on each task. According to Harris's expert, David A. Robinson, Esq., whose declaration it submitted in opposition to the attorney fees motion, block billing accounted for 88 percent of the time entries.

47.

Harris contends block billing is "improper" because it "obscure[s] the nature of the work claimed," and asserts that where an attorney's bill is dominated by block billing, trial courts will apply a 10 to 30 percent reduction to the entire bill. Harris argues reduction of the Flynn Williams fees was mandated here because the time records were "woefully inadequate" due to the block billing and the failure to record time records in anything less than .2 of an hour. Harris urges us not to give deference to the trial court's ruling due to its failure to account for the block billing in the attorney fees award, and asks us to reverse the award and remand the matter to the trial court to rule on the reasonableness of the block billing.

As one appellate court has explained, block billing "is not objectionable 'per se,' though it certainly does increase the risk that the trial court, in a reasonable exercise of its discretion, will discount a fee request." (*Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830 (*Jaramillo*).) "Blockbilling is particularly problematic in cases where there is a need to separate out work that qualifies for compensation under [Government Code] section 1021.5 from work that doesn't. (See *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689 (*Bell*) [blockbilling made it 'virtually impossible' to separate out compensable Brown Act violation work from other work].)" (*Jaramillo*, *supra*, 200 Cal.App.4th at p. 830.) In *Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, the appellate court upheld the reasonableness of a fee award supported in part by block billed entries, explaining that the trial court was in a position to determine whether the tasks described in the statements reasonably required the total amount of time billed each month. (*Id.* at pp. 102-103.)

Harris cites no California case or statutory authority prohibiting block billing. The cases it does cite are either ones where, like *Bell*, block billing rendered it impossible to apportion attorney fees between claims on which attorney fees could or could not be awarded, or in which the appellate court found no abuse of discretion in reducing fees due to block billing. (See *Track Mortgage Group, Inc. v. Crusader Ins. Co.* (2002)

48.

98 Cal.App.4th 857, 867-868 [finding no abuse of discretion in trial court's reduction of attorney fees where, due to the attorney's billing system, it was nearly impossible to segregate fees between claim upon which attorney fees was recoverable and claims on which fees were not]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020 [after appellate court determined defendants were entitled to recover attorney fees and costs in moving to strike some, but not all, of the plaintiff's claims, it noted that on remand, it was defendants' burden to produce records sufficient to provide a basis for determining how much time was spent on particular claims and the court properly could reduce compensation for any failure to maintain appropriate time records]; *Lahiri v. Universal Music and Video Distribution Corp.* (9th Cir. 2010) 606 F.3d 1216, 1222-1223 [trial court did not abuse its discretion in reducing block billed fees by 30 percent].)

Here, unlike *Bell* and the other cases upon which Harris relies, there was no need to separate out covered from uncovered work. While trial courts retain discretion to penalize block billing when the practice prevents them from discerning which tasks are compensable and which are not (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1324–1325; *Bell, supra*, 82 Cal.App.4th at p. 689), the trial court identified no such problem here. Moreover, whatever form of billing is used, the question is whether the billing provides the trial court with a reasonable basis for awarding attorney fees. In this case, the trial court did reduce the Flynn Williams bills by $20,865 where redactions "failed to provide the [c]ourt with a reasonable basis for evaluating certain claimed fees[,]" and otherwise had no difficulty with Spencer's attorneys' billings. We find no abuse of discretion in failing to further reduce the bills due to block billing.

Harris next contends the trial court improperly awarded Spencer $4,964 in fees for the period of September 13 through November 3.[18]  As Spencer has explained, both below and on appeal, these fees were not included in the total fees it sought.  In a declaration, Spencer's attorney states that when his office generated the total fees, its accounting database excluded any fees accrued between September 13 through November 3, and while one of the invoices submitted in support of the motion contains unredacted fee entries on November 1, 2 and 3, these fees were not included in the total fees Spencer sought to recover.  In reply, Harris asserts the trial court erred because it did not indicate the fees were stricken in its order.  The trial court, however, awarded Spencer the fees it requested, less reductions for redacted work, which Spencer verified did not include the prohibited fees.  Since the trial court's award did not include the prohibited fees, it was not necessary for the trial court to state in its order that they were stricken.

Finally, Harris contends the trial court should have stricken the fees of Spencer's prior counsel, McInerney, because it was impossible to figure out what work was done from the invoice submitted in support of the motion and the fees were not supported by a declaration from a McInerney attorney.  In its motion, Spencer requested $15,733 in fees and costs for work performed by McInerney.  In support, it submitted a declaration from William J. McGahan, who performed work on the case, in which he stated that true and correct copies of the McInerney attorney billing ledger containing the fees and costs McInerney incurred in representing Spencer were attached to the declaration, and explained that client bills were generated after time spent on all matters was entered into the computer and summarized on the ledger.  McGahan further stated that "[t]he

---

[18] Although Harris uses November 9, 2011 in its appellate briefs, both Harris and Spencer agree on appeal that, in settling the change order claim, Spencer released its claim for attorney fees between September 13, 2011 and November 3, 2011, and therefore the November 9 date that appears on one version of the settlement agreement is incorrect.

descriptive matter in the billing ledger has been redacted but will be made available without the redactions for the Court's *in camera* review, if necessary." The attached billing ledger shows that 57.60 hours were billed totaling $14,740. Spencer also submitted an expert witness declaration from an attorney who reviewed McInerney's attorney fee billing ledger and opined the fees were reasonable under the circumstances.

In opposing the motion, Harris objected to the McInerney fees because the tasks performed were redacted from the ledger. In reply, Spencer submitted a declaration from Flynn Williams attorney Sloan C. Bailey, who stated that a true and correct unredacted copy of McInerney's invoice was attached as an exhibit, which reflected total attorney fees of $14,740. The unredacted invoice, however, is not attached to Bailey's declaration in the clerk's transcript and it does not appear to be included there, as neither party points us to where it is located in the 12,585 page clerk's transcript and we could not locate it.

Harris filed an objection to the invoice on the grounds that it was presented too late and lacked a declaration from a McInerney attorney authenticating it. At oral argument on the motion, Harris's attorney again objected to the original McInerney bill as unreasonable, and the new bill submitted with the reply as untimely and unaccompanied by a declaration authenticating it. In response, Spencer's attorney stated the bill was not new, as it had been submitted several times with Spencer's papers, and the hours and fees had always been available for opposing counsel's analysis. Spencer's attorney admitted that Bailey would not have personal knowledge of the work that appeared on McInerney's bill, but Bailey knew the bill was the same one McGahan had declared under oath was accurate.

As appellant, Harris bears the burden of affirmatively demonstrating error. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631-632; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 (*Ketchum*).) Harris failed to include in the record the McInerney invoice submitted with Bailey's reply declaration that purportedly details the work McInerney performed. While Harris contends McInerney's invoices did not

provide sufficient detail for the trial court to determine whether the fees claimed were reasonable, we presume the invoice submitted with the reply brief provided the necessary detail. On at least two occasions, our Supreme Court has articulated this principle, which is particularly applicable here: "'It is the burden of the party challenging the fee award on appeal to provide an adequate record to assess error. [Citations.] Here, [Harris] should have augmented the record with [the missing document]. [Citations.] Because [it] failed to furnish an adequate record of the attorney fee proceedings, [Harris's] claim must be resolved against [it].'" (*Ketchum, supra,* 24 Cal.4th at pp. 1140–1141; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296.)

Harris complains that the McInerney invoice was not authenticated. Harris, however, cites no authority to show that Bailey could not authenticate the unredacted invoice as being the same redacted invoice McInerney attorney McGahan previously authenticated. Therefore, Harris has not shown that the trial court abused its discretion in admitting the unredacted invoice and relying upon it to determine the reasonableness of the requested fees. (*Nielsen*, *supra*, 178 Cal.App.4th at p. 324; *Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)

In sum, Harris has not shown that the trial court erred in its award of attorney fees to Spencer.

## **DISPOSITION**

The judgment against Harris is modified to reduce the award of prejudgment interest from $384,678 to $341,667.  As so modified, the judgment is affirmed.  Costs on appeal are awarded to Spencer.

_____
Gomes, Acting P.J.

WE CONCUR:


_____
Franson, J.


_____
Peña, J.

53.